UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KEVIN WHITNEY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 18-11095-JCB |
| | ) |
| ANDREW SAUL,[1] | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

ORDER ON WHITNEY'S MOTION FOR ORDER REVERSING THE
COMMISSIONER'S DECISION AND DEFENDANT'S
MOTION TO AFFIRM THE COMMISSIONER'S DECISION
[Docket Nos. 15, 22]

August 29, 2019

Boal, M.J.

This is an action for judicial review of a final decision by the Commissioner of the Social Security Administration ("Commissioner") denying Kevin Whitney's applications for disability insurance benefits ("DIB") and supplemental security income ("SSI"). Whitney asserts that the Commissioner's decision denying him such benefits – memorialized in an August 30, 2017 decision of an administrative law judge ("ALJ") – is in error, [Docket No. 15], and the Commissioner, in turn, has moved to affirm [Docket No. 22].[2] For the following reasons, this Court remands the case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for

---

[1] Andrew Saul, who is now the Commissioner of Social Security, is substituted for former Deputy Commissioner Nancy A. Berryhill as the defendant in this suit pursuant to Federal Rule of Civil Procedure 25(d).

[2] On April 18, 2019, the parties consented to the exercise of jurisdiction by a United States Magistrate Judge for all purposes, Docket No. 26, and the case was reassigned to the undersigned on May 15, 2019. Docket No. 31.

1

further findings and/or proceedings consistent with this opinion.

I.      FACTS AND PROCEDURAL HISTORY

    A.      Procedural History

Whitney filed an application for DIB and SSI on February 26, 2015,[3] alleging disability beginning June 15, 2013. (Administrative Record ("AR") 218-33). His application identified a bulging disc in left side of back, C-DIFF, and lumbar and cervical degenerative issues. (AR 79, 109, 254). The Commissioner denied his application initially (AR 107-08) and on reconsideration. (AR 145-46). On March 24, 2017, Administrative Law Judge ("ALJ") Kim K. Griswold held a hearing at which a Vocational Expert ("VE") and Whitney, represented by counsel, appeared and testified. (AR 42-77). The ALJ issued a decision on August 30, 2017 finding that Whitney was not disabled. (AR 16-36). The Appeals Council denied Whitney's request for review on April 11, 2018, making the ALJ's decision the final decision of the Commissioner (AR 7-9). Whitney filed this action on May 23, 2018. Docket No. 1.

    B.      Background

Whitney was fifty-three years old at the time of the ALJ's decision (AR 79, 93) and was forty-nine years old on June 15, 2013, the alleged onset date. (AR 34, 93). He had past relevant work as a disc jockey and painter. (AR 90).

    C.      Medical Evidence[4]

On May 10, 2012, Whitney underwent an initial psychiatric evaluation with Bernard Szymanski, R.N.C.S., for self-reported depression. (AR 462-467). Whitney reported poor

---

[3] There is a discrepancy in the record concerning the date of the applications. Other portions of the record suggest a November 18, 2014 application date. See, e.g., AR 47, 79.

[4] Because Whitney's arguments focus on the ALJ's assessment of his mental functioning, this Court focuses on his mental health treatment.

eating, sleeping, and concentration. (AR 462). He was prescribed with 20MG of Ritalin to be taken twice daily. (AR 467). At a follow-up appointment on May 31, 2012, Szymanski noted that Whitney's attention and focus were "good" and that his response to intervention was "stable." (AR 460).

On May 14, 2013, Szymanski saw Whitney to monitor his prescription of Ritalin. (AR 441). Whitney reported that his attention and focus were good. Id. He also noted that he was working and more organized. Id.

On February 20, 2014, Whitney reported to Szymanski that his attention and focus were good, that he was less anxious and that he was working. (AR 438). Szymanski noted that, although Whitney's ADD was improving, his depression was worsening. (AR 434). Whitney remained on 20 mg Ritalin three times daily and .5mg Ativan twice daily. Id. Szymanski also prescribed Whitney with 20mg Lexapro once daily in order to treat his depression. Id.

Between April 15, 2014 and June 3, 2014, Szymanski reported that Whitney was improving moderately and symptom severity was severe. (AR 428, 430, 432). On July 1, 2014, Szymanski reported that Whitney was improving significantly. (AR 426). Records from October 20, 2014 through March 9, 2015 state that Whitney was improving moderately. (AR 418, 420, 422, 424).

Whitney met with therapist Katherine McCloskey for an initial intake examination on June 9, 2015. (AR 522-526). He sought therapy for depression because his wife of 27 years had filed for divorce and he noted having more sad days than happy ones. (AR 522). Prior to meeting with Ms. McCloskey, Whitney had seen a therapist one time and previously had experienced depression following the death of his mother. Id.

At his initial visit, Whitney exhibited moderate impulse control, difficulty acknowledging

psychological problems, and some impaired ability to make reasonable decisions. (AR 524-525). However, his thought content, memory, orientation, intellectual functioning, and affect were within normal limits. (AR 525). Ms. McCloskey assessed Whitney with ADD with hyperactivity and an unspecified adjustment reaction, and further advised him to continue therapy through his ongoing divorce in order to learn skills to cope with depression. (AR 526). She assigned Whitney a Global Assessment of Functioning ("GAF") score of 65.[5] (AR 526).

On June 16, 2015, Whitney continued to exhibit signs of depression related to his divorce but had normal affect and thought process. (AR 520). On June 26, 2015, Whitney reported to Ms. McCloskey that he felt "physically sick, nauseas [sic], overwhelmed and [had] trouble breathing" as a result of text confrontations with his wife. (AR 517). He recently had been prescribed a new anxiety medication. Id. Ms. McCloskey counseled Whitney on grief and advised him on therapeutic interventions like reflective listening and reframing. Id.

A few weeks later, on July 17, 2015, Whitney described his wife's continued verbal

---

[5] Prior to 2013, the GAF Scale was used for reporting a clinician's judgment of the individual's overall level of functioning and concerns psychological, social and occupational functioning and, unless otherwise noted, refers to the level of functioning at the time of evaluation. See Am. Psychiatric Ass'n, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32-33 (4th ed., text revision 2000) (hereinafter DSM-IV). It should be noted that since 2013, the GAF score is no longer used in the Diagnostic and Statistics Manual of Mental Disorders. Negrón v. Colvin, Civ. No. 13-1926 CVR, 2015 WL 1499144, at *4 n.4 (D.P.R. Apr. 1, 2015); Hall v. Colvin, 18 F. Supp. 3d 144, 153 (D.R.I. 2014) (citation omitted). On July 22, 2013, the Social Security Administration published Administrative Memorandum AM-13066 in order to guide adjudications on using GAF scores. Bourinot v. Colvin, 95 F. Supp. 3d 161, 178 (D. Mass. 2015). This memorandum "indicates that the SSA will continue to receive and consider GAF scores just as it would other opinion evidence, but scores must have supporting evidence to be given significant weight." Id. (citing Kroh v. Colvin, Civ. No. 3:13-CV-01533, 2014 WL 4384675, at *18 (M.D. Pa. Sept. 4, 2014)).

A GAF score in the 61-70 range "is consistent with not more than mild symptoms or impairment of social function." Resendes v. Astrue, 780 F. Supp. 2d 125, 132, n. 4 (D. Mass. 2011) (citation omitted). "Persons with a GAF in that range might have 'possible difficulty in occupational or social functioning, but generally functio[n] fairly well.'" Id. (citation omitted).

attacks via text message and feelings of anger and irritability at speaking with her. (AR 512). Whitney was receptive to Ms. McCloskey's recommendation that he set limits with his wife. Id. In a subsequent visit on July 24, 2015, Whitney described "crying a lot" in anticipation of visiting his old home and acknowledged that he spent much time at home sleeping and dwelling on the end of his marriage. (AR 510).

Between July and September 2015, Whitney visited Ms. McCloskey weekly and continued to report ups and downs with his wife. (AR 502, 504, 506, 508). On September 16, 2015, Whitney reported that his divorce had been granted on the day prior and afterwards he had experienced a "breakdown" and became physically ill with grief. (AR 497). He told Ms. McCloskey that he realized his marriage was truly over and that there was no chance of reconciliation. Id. Ms. McCloskey helped him manage the loss. Id. Whitney reported that he was working a few nights a week and that doing so improved his mood. Id.

In a session on October 14, 2015, Whitney identified that he frequently was "snapping" at his roommate. (AR 609). Ms. McCloskey indicated that he was projecting his anger towards his ex-wife at his roommate. Id. Ms. McCloskey discussed anger management strategies. Id.

On November 6, 2015, Whitney reported that he had entered the "anger" stage of his divorce. (AR 605). Ms. McCloskey mentally prepared Whitney for an upcoming dinner with his ex-wife, which he ultimately did not attend. (AR 605, 601).

Whitney saw Szymanski on November 10, 2015 for a check-up. (AR 603). Szymanski documented Whitney's depression as moderate severity but control status improving moderately. Id. Whitney exhibited normal speech, logical thought processes and reasoning, intact judgment, and normal mood and affect. Id. Whitney was prescribed with 20mg Ritalin to be taken four times daily. Id.

On November 12, 2015, during an appointment with Ms. McCloskey, Whitney expressed confusion at a text from his ex-wife and continued hurt at her decision to divorce him. (AR 601). Ms. McCloskey noted that Whitney's emotional state was irritable and depressed. Id.

On January 4, 2016, Ms. McCloskey met with Whitney upon his return from a month-long trip to Florida to visit his ailing father. (AR 596). Whitney relayed that his visit was positive but identified that he has experiencing withdrawal symptoms from tapering off Methadone. Id. Whitney thereafter was prescribed Suboxone to aid the withdrawal but reported feeling physically ill for several days. (AR 586).

In a later visit on February 1, 2016, Whitney discussed "the significance of finding purpose in his life" and voiced a desire to be more active. Id. Ms. McCloskey advised him on various agencies that could help him find work or enroll in school. Id. Whitney felt "ready to rejoin the world." Id.

On February 22, 2016, Whitney stated that he felt better physically but was more depressed and irritable towards his roommate. (AR 578). Ms. McCloskey helped Whitney connect his mood to isolation and too much time spent at home. Id. They explored options for more socialization, which Whitney acknowledged helped him feel better. Id.

During his following visit on March 7, 2016, Whitney reported that he was trying to improve his relationship with his roommate and recently had supported her following her brother's passing. (AR 574). In sessions between March and the end of April, Whitney discussed increased contact with his ex-wife and expressed confusion and anxiety over their relationship. (AR 560, 562).

On April 25, 2016, Whitney reported that he had stopped taking his medication the week prior because he felt that he did not need it. (AR 555). He stated that within twelve hours his

depression was significant. Id. Three days later, Whitney began taking the medication again, realizing its importance to his wellbeing. Id.

In a follow-up appointment with Szymanski on July 27, 2016, Whitney stated that he was "fine." (AR 551). Szymanski continued to report that Whitney's depression was moderate in severity but improving moderately. Id. Whitney similarly reported that he was "fine" at an appointment with Szymanski on January 1, 2017. (AR 547). Szymanski's assessment remained the same. Id.

  D. Opinion Evidence

State agency consultant Dr. Joseph Whitehorn opined that Whitney had the ability to carry out short and simple instructions and to sustain an ordinary routine without special supervision. (AR 88-90, 102-104). He also opined that Whitney was moderately limited in his ability to carry out detailed instructions; to maintain attention and concentration for extended periods; to complete a normal workday and workweek without interruptions; and to respond appropriately to changes in the work setting. Id. In addition, Dr. Whitehorn opined that Whitney was able to sustain pace and focus on simple tasks for two-hour periods during a work day. (AR 89, 103).

On May 13, 2015, Dr. Whitehorn completed a Medically Determinable Impairments and Severity questionnaire. (AR 98-99). He concluded that although Whitney had medically determinable impairments, they did not satisfy the diagnostic criteria of a listing. Id.

On October 10, 2015, state agency consultant Dr. Brian O'Sullivan completed a Residual Functioning Capacity questionnaire. (AR 122). He opined that Whitney was moderately limited in his ability to carry out detailed instructions and maintain attention and concentration for extended periods. Id. Dr. O'Sullivan also opined that "if facing [a] very emotionally disturbing

event [Whitney] might miss a day [of work] or break early to cope with emotions," but there was "no indication this would be frequent or ongoing limit." (AR 123). In addition, Dr. O'Sullivan reported that despite Whitney's conditions, he is "able to sustain average pace and focus on simple tasks over a regular full-time routine." Id.

On October 10, 2015 Dr. O'Sullivan also completed a Medically Determinable Impairments and Severity questionnaire. (AR 135-37). He opined that although medically determinable impairments were present, they did not precisely satisfy the diagnostic criteria. (AR 136). He further explained that Whitney's depression and anxiety were credible but not disabling and "improved with brief passage of time, treatment, and experience of positive or less emotionally disturbing events." (AR 136-37).

On March 15, 2016, Ms. McCloskey completed a Residual Functioning Capacity questionnaire. (AR 533). She reported that Whitney's depression resulted in: anhedonia or pervasive loss of interest in almost all activities; appetite disturbance with weight change; decreased energy; blunt, flat or inappropriate effect; feelings of guilt or worthlessness; generalized persistent anxiety; mood disturbance; difficulty thinking or concentrating; persistent disturbances in mood or affect; change in personality; emotional withdrawal or isolation; hyperactivity; emotional lability; flight of ideas; easy distractibility; memory impairment; and sleep disturbances. (AR 534).

McCloskey assessed that Whitney was "unable to meet competitive standards" in order to: remember work-like procedures, maintain attention for two hour segments, maintain regular attendance and be punctual, complete a normal workday and workweek without interruptions from psychologically based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods (AR 535-36). McCloskey also concluded that Whitney's

anxiety and depression "impact his ability to follow through with detailed tasks." (AR 536). She determined that his chronic pain, which is worsened by depression, would cause Whitney to be absent more than four days per month. (AR 537). However, McCloskey opined that Whitney's mental health was manageable through treatment and medication and noted that Whitney was working to stabilize his moods and address his chronic pain and mental health diagnoses. (AR 533).

      E.      <u>Hearing Testimony</u>

Kevin Whitney testified at his hearing on March 24, 2017. (AR 48-69). He reported that he had been seeing a counselor for a couple of years and had been diagnosed with ADD during his adulthood. (AR 68). He testified that at the current time he was taking Ritalin for ADD and Zoloft for depression, which helped him not "want to walk off a bridge." <u>Id.</u> He said that, despite the medicine, he was still having a difficult time. <u>Id.</u>

VE Elaine Cogliano testified. (AR 70). Whitney did not object to her qualifications. (AR 70). The ALJ presented the following hypothetical to VE Cogliano:

> [L]et's assume an individual as the same age as the Claimant, which is an individual who is younger to closely approaching advanced age…who has…high school then two years of college, and the same work experience. They're able to lift and carry up to 20 pounds occasionally and ten pounds frequently. They cannot perform overhead reaching and they cannot lift from below the waist. They can stand and walk for four hours in an eight-hour day and they can sit eight hours in an eight-hour day. They can occasionally stoop, crouch, kneel, balance, and climb ramps and stairs but they cannot crawl or climb ladders, ropes, or scaffolds. They can understand, remember, and carry out simple instructions without strict rate pace or performance requirements, and they can adopt to occasional change in the routine work setting.

(AR 71). The ALJ also included environmental limitations of no dangerous machinery and unprotected heights, no vibration, and occasional exposure to extreme cold. (AR 74). In response, VE Cogliano testified that Whitney would be unable to perform his past work, but that

he could perform the jobs of ticket seller, mail sorter, and an inspector in the local and national economy. (AR 71-72). VE Cogliano noted that she had reduced all of the jobs by 50 percent in Massachusetts and nationally to allow for standing and walking only four hours based on her experience. (AR 72).

The ALJ then altered the hypothetical: the individual was able to stand and walk two hours in an eight-hour day and could sit up to eight hours in an eight-hour day. (AR 72). Under that hypothetical, VE Cogliano testified that Whitney could still perform the jobs of ticket seller, mail sorter, and an inspector, in addition to the sedentary position of a telephone clerk. (AR 72).

The ALJ then added an additional limitation to the original hypothetical wherein the individual is limited to occasional reaching in all directions with the right dominant upper extremity. (AR 73). VE Cogliano testified that Whitney would not be employable under those conditions. Id.

Whitney's counsel then presented the following hypothetical to VE Cogliano based on Dr. Perez-Velasquez's assessment of Whitney from May 2016:

> Less than ten pounds frequently, less than two hours stand/walk, less than six hours sit, push and pull is limited in the upper and lower extremities, never climbing or crawling, occasional for the other postural, and then Claimant would likely be off task 50 to 20% of an eight-hour day and limited exposure to vibration and hazards.

(AR 74). Under that hypothetical, VE Cogliano testified that Whitney would be unemployable. Id.

After giving Whitney's counsel 30 days to procure additional, relevant records from his primary care doctor, the ALJ explained to counsel that she "want[ed] to make it very clear that should you provide any additional records, anything other than [these treatment notes] that you provide argument as to why they should be admitted late and would meet the requirements of [20

C.F.R. §] 405.331 for late submission." (AR 75-76).  On April 18, 2017, Whitney's counsel submitted an affidavit from David Meuse, a rehabilitation counselor.  See Docket No. 16 at 1-5.  This evidence was not included in the administrative record.

II.     STANDARD OF REVIEW

A court may not disturb the Commissioner's decision if it is grounded in substantial evidence.  See 42 U.S.C. §§ 405(g) and 1383(c)(3).  Substantial evidence is such relevant evidence as a reasonable mind accepts as adequate to support a conclusion.  Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).  The Supreme Court has defined substantial evidence as "more than a mere scintilla."  Richardson v. Perales, 402 U.S. 389, 401 (1971).  Thus, even if the administrative record could support multiple conclusions, a court must uphold the Commissioner's findings "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support his conclusion."  Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991) (citation and internal quotation marks omitted).

The resolution of conflicts in evidence and the determination of credibility are for the Commissioner, not for doctors or the courts.  Rodriguez, 647 F.2d at 222; Evangelista v. Sec'y of Health & Human Servs., 826 F.2d 136, 141 (1st Cir. 1987).  A denial of benefits, however, will not be upheld if there has been an error of law in the evaluation of a particular claim.  See Manso-Pizarro v. Sec'y of Health & Human Servs., 76 F.3d 15, 16 (1st Cir. 1996).  In the end, the court maintains the power, in appropriate circumstances, "to enter . . . a judgment affirming, modifying, or reversing the [Commissioner's] decision, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

III.    DISCUSSION

An individual is entitled to DIB benefits if, among other things, he has an insured status

and, prior to its expiration, is disabled. See 42 U.S.C. § 423(a)(1)(A) and (E). Entitlement to SSI, on the other hand, requires a showing of both disability and financial need. See 42 U.S.C. § 1381a. Whitney's need, for purposes of SSI, and his insured status, for purposes of DIB, are not challenged.

      A.      Disability Standard And The Commissioner's Decision

The Social Security Act (the "Act") defines disability, in part, as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). See also 42 U.S.C. § 1382c(a)(3)(A) (similar). An individual is considered disabled under the Act

> only if his physical and mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B). See generally Bowen v. Yuckert, 482 U.S. 137, 146-49 (1987).

In determining disability, the Commissioner follows the five-step protocol described by the First Circuit as follows:

> First, is the claimant currently employed? If he is, the claimant is automatically considered not disabled.
>
> Second, does the claimant have a severe impairment? A "severe impairment" means an impairment "which significantly limits the claimant's physical or mental capacity to perform basic work-related functions." If he does not have an impairment of at least this degree of severity, he is automatically not disabled.
>
> Third, does the claimant have an impairment equivalent to a specific list of impairments in the regulations' Appendix 1? If the claimant has an impairment of so serious a degree of severity, the claimant is automatically found disabled.

. . . .

    Fourth . . . does the claimant's impairment prevent him from performing work of the sort he has done in the past? If not, he is not disabled. If so, the agency asks the fifth question.

    Fifth, does the claimant's impairment prevent him from performing other work of the sort found in the economy? If so he is disabled; if not he is not disabled.

Goodermote v. Sec'y of Health & Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982).

    At step one, the ALJ found that Whitney had not engaged in substantial gainful activity since June 15, 2013, the alleged onset date. (AR 22). At step two, the ALJ found that Whitney has the following severe impairments: lumbar and cervical degenerative changes, obesity, right shoulder impairment, attention deficit disorder, anxiety disorder, and depressive disorder. Id. At step 3, the ALJ found that Whitney's impairments did not meet or medically equal any entry on the Listing of Impairments. (AR 27-29). In assessing residual functional capacity, the ALJ found that Whitney had the residual functional capacity to perform light work with some limitations. Specifically, Whitney is able stand and walk up to four hours and sit for eight hours in an eight-hour workday. (AR 29). In addition, Whitney cannot perform overhead reaching with the bilateral upper extremities; cannot perform lifting from below waist level with the bilateral upper extremities; can perform occasional stooping, crouching, kneeling, balancing, and climbing ramps and stairs; cannot crawl or climb ladders, ropes, or scaffolds; cannot tolerate exposure to vibration or hazards such as dangerous moving machinery and unprotected heights; can tolerate occasional exposure to extreme cold. Id. Finally, Whitney can understand, remember, and carry out simple instructions without strict rate, pace, or performance requirements throughout an ordinary workday or workweek with normal breaks on a sustained basis and can adapt to simple and occasional change in the routine work setting. Id. At step four, the ALJ found that Whitney could not perform his past relevant work. (AR 34). At step five, the ALJ found that, considering Whitney's age, education, work experience and residual

functional capacity, there are jobs that exist in significant numbers in the national economy that he could perform. (AR 34-35). Accordingly, the ALJ found that Whitney was not disabled. (AR 35-36).

### B. The ALJ's Residual Functional Capacity Assessment Is Supported By Substantial Evidence

Whitney challenges the ALJ's RFC determination with respect to his mental impairments. Docket No. 15 at 12-14. Whitney points to the ALJ's finding that he "can understand, remember, and carry out simple instructions *without strict rate, pace, or performance requirements* throughout an ordinary workday or workweek with normal breaks on a sustained basis." Id. at 12 (emphasis in original) (citing to AR 29). Whitney argues that the ALJ did not clarify how she derived Whitney's RFC with respect to concentration, persistence, or pace in light of the conflicting opinions in the record. Id. at 12-14. According to Whitney, because the ALJ did not clarify how she derived the specific limitation of no "strict rate, pace, or performance requirements," from the medical sources in the record, she overstepped the bounds of her expertise as a lay person. Id. at 14. This Court disagrees.

Although determination of a claimant's RFC is an administrative decision that is the responsibility of the Commissioner, see 20 C.F.R. § 404.1527(e)(2), SSR 96-5p, 1996 WL 374183, at *2, an ALJ, as a lay person, cannot interpret a claimant's medical records to determine his RFC. Manso-Pizarro, 76 F.3d at 17. An ALJ must rely to some degree on RFC evaluations from a physician or another expert. Id. at 17-18. This does not mean, however, "that there must always be some super-evaluator, a single physician who gives the factfinder an overview of the entire case." Evangelista, 826 F.2d at 144. Rather, "an ALJ is entitled to piece together the relevant medical facts from the findings of multiple physicians." Mulkerron v. Astrue, No. 09-10998-RGS, 2010 WL 2790463, at *9 (D. Mass. July 15, 2010) (quotations

14

omitted). In other words, although an ALJ cannot <u>ab initio</u> interpret medical records to determine a claimant's RFC, he can "render[] common-sense judgments about functional capacity based on medical findings." <u>Gordils v. Sec'y of Health and Human Servs.</u>, 921 F.2d 327, 329 (1st Cir. 1990). Thus, observations from medical sources which do not explicitly address functional limitations can still inform an ALJ's RFC determination, "as long as the [ALJ] does not overstep the bounds of a lay person's competence and render a medical judgment." <u>Id.</u>

>   Here, the ALJ explained that:

> The avoidance of rate, pace, or performance requirements (i.e. quotas) addresses [Whitney's] issues of anxiety and some preoccupation with his family matters/divorce. Given the preoccupation with the divorce and anxiety over the upheaval in his life, the Undersigned has addressed by adding a limitation that precludes a position that demands strict rate, pace or production requirements.

(AR 32). Moreover, the ALJ explained that she gave some weight to the opinions of State agency consultants Dr. Whitehorn and Dr. O'Sullivan. (AR 33). The ALJ noted that he adopted the state agency limitations, of simple tasks and simple routine changes, based on Whitney's ADD and depression. <u>Id.</u> The ALJ's assessed RFC is consistent with the State agency consultants' opinions. Dr. Whitehorn opined that Whitney was able to sustain pace and focus on simple tasks for two hour periods during a work day. (AR 89, 103). Although Dr. O'Sulllivan found that Whitney may *occasionally* miss a day or break early to cope with emotions if facing a very emotionally disturbing event, he also opined that there was no indication that this would be a "frequent or ongoing limit." (AR 123, 141). Thus, the ALJ's RFC findings regarding concentration, persistence, or pace are supported by substantial evidence.

>   C.   <u>The ALJ Erred In Not Admitting The Affidavit Of David Meuse Into The Record</u>

>   Whitney argues that the ALJ erred by failing to consider, or even exhibit, the opinion of

his vocational expert, David Meuse. Docket No. 15 at 6. The Commissioner responds that the ALJ was not required to exhibit or consider the Meuse's affidavit because its submission was untimely and Whitney did not provide any argument as to why this evidence should be considered at that time, as the ALJ requested. Docket No. 23 at 10-11.

An ALJ is required to consider all the evidence in a claimant's file. DaSilva-Santos v. Astrue, 596 F. Supp. 2d 181, 188 (D. Mass. 2009). However, a claimant is generally required to submit any written evidence "no later than 5 business days before the date of the scheduled hearing." 20 C.F.R. § 404.935(a). If an applicant misses the deadline and wishes to submit additional evidence, the ALJ "will accept the evidence if he or she has not yet issued a decision" and the claimant did not inform the ALJ of the evidence before the deadline because, among other reasons, "some . . . unusual, unexpected, or unavoidable circumstance beyond your control prevented you from informing us about or submitting the evidence earlier." 20 C.F.R. § 404.935(b)(3). However, even if this requirement is not met, the ALJ still has the discretion to consider the evidence. Palombo v. Berryhill, No. 17-cv-284-LM, 2018 WL 3118286, at *4 (D.N.H. Jun. 25, 2018).

Here, an unavoidable circumstance beyond Whitney's control prevented him from submitting the Meuse affidavit earlier "since the claimant has no clue to what the vocational expert will testify until the end of the hearing." Palombo, 2018 WL 3118286, at *5 (quoting McClesky v. Astrue, 606 F.3d 351, 354 (7th Cir. 2010)). Indeed, Social Security Ruling ("SSR") 96-9p recognizes that submitting this kind of rebuttal evidence is appropriate:

> At the hearings and appeals levels, vocational experts (VEs) are vocational professionals who provide impartial expert opinion during the hearings and appeals process either by testifying or by providing written responses to interrogatories. A VE may be used before, during, or after a hearing. <u>Whenever a VE is used, the individual has the right to review and respond to the VE evidence prior to the issuance of the decision.</u> The VE's opinion

> is not binding on an adjudicator, but must be weighed along with all other evidence.

SSR 96-9p, 1996 WL 374185, at *9, n. 8 (July 2, 1996) (emphasis added).[6] Thus, the ALJ erred in not admitting the Meuse affidavit into the record.[7]

### D. The ALJ's Failure To Consider The Meuse Affidavit Was Not Harmless

The Commissioner argues that even if the ALJ had considered the Meuse affidavit, there is nothing in the affidavit that would have changed the ALJ's findings and, therefore, any error was harmless. Docket No. 23 at 14-20. This Court disagrees.

At Step 5 of the sequential evaluation process, 20 C.F.R. § 404.1520(a)(4)(v), the burden shifts to the Commissioner to show that there is a significant number of jobs in the national economy (either in the region where the claimant lives or in several regions in the country). 20 C.F.R. § 404.1560(c)(1). At the hearing, the VE testified that a person with Whitney's RFC would be able to perform the following jobs: (1) ticket seller, of which there are 125,000 jobs in the national economy and 500 in Massachusetts; (2) inspector, of which there are 55,000 jobs in the national economy and 600 in Massachusetts; and (3) mail sorter, of which there are 40,000 in the national economy and 400 in Massachusetts. (AR 71-72). The VE further testified that,

---

[6] The Commissioner argues that the ALJ was under no obligation to exhibit the Meuse affidavit because Whitney did not provide any argument as to why this evidence should have been permitted, as the ALJ requested. Docket No. 23 at 11. However, in his transmittal letter, Whitney's counsel stated that "[a]s you know, whenever a vocational witness is used, the individual has the right to review and respond to the VE evidence prior to the issuance of a decision." Docket No. 16 at 1. While counsel did not cite to SSR 96-9p, the language used in the letter is identical to the language in SSR 96-9p discussing the submission of rebuttal expert testimony.

[7] The Court notes that despite admitting other late submitted evidence into the record, see AR 19-20, the ALJ did not even reference Meuse's affidavit or evaluate its admissibility under 20 C.F.R. § 404.935 or SSR 96-9p. Thus, the Commissioner's arguments why the ALJ could have refused to exhibit the Meuse affidavit amount to post hoc rationalizations that this Court should not consider. See Palombo, 2018 WL 3118286, at *5, n. 6.

based on her experience, she had reduced the jobs by 50% in order to allow for standing and walking four hours only. (AR 72). Based on that testimony, the ALJ found that there is a significant number of jobs in the economy that Whitney could perform and, therefore, that he was not disabled. (AR 34-35).

In his affidavit, Mr. Meuse opined, among other things, that the VE's testimony regarding the numbers of jobs available in the economy was flawed. See Docket No. 16 at 3-4. According to him, the numbers used by the VE are outdated. Based on JobBrowser Pro and his experience, he opined that there are no more than: (1) 5,000 ticket seller jobs in the national economy and a handful in Massachusetts; (2) 723 inspector jobs in the national economy and 13 in Massachusetts; and (3) 3,400 mail sorter jobs in the national economy and 77 in Massachusetts. Docket No. 16 at 4. There is, therefore, a significant discrepancy in each of the expert's testimony regarding the number of jobs available in the national economy that Whitney could perform.

The Commissioner argues that, even if the ALJ were to accept Mr. Meuse's numbers, there would at least be one job existing in significant numbers in the national economy. Docket No. 23 at 19. However, it does not appear that Mr. Meuse has reduced the number of jobs available to account for the restriction to standing for four hours out of an eight-hour workday. If a 50% reduction were applied, as the VE found to be appropriate, the number of available jobs is significantly reduced and it is not clear that such numbers would be sufficient to meet the Commissioner's burden at Step 5. See, e.g., Racicot v. Astrue, No. 04-11556-RWZ, 2007 WL 2712488, at *6 (D. Mass. Sept. 4, 2007) (more than 140 positions in a state and more than 4,400 nationally are necessary to a finding of significant numbers). Thus, at least in this respect, the Meuse affidavit could have made a difference in the outcome.

The Commissioner is correct that it is the ALJ's prerogative to resolve conflicts in the evidence and determine issues of credibility.  See Docket No. 23 at 20 (citing Brownell v. Berryhill, No. 17-11462-FDS, 2018 WL 3150222, at *13 (D. Mass. June 27, 2018)).  It is entirely possible that, had she admitted and considered the Meuse affidavit, the ALJ would have still credited the VE's testimony over Mr. Meuse's.  However, the problem is that she did not actually consider it and, therefore, failed to resolve the conflicts in the evidence.  Therefore, the Commissioner's arguments regarding the reasons why the Meuse affidavit would not have changed the ALJ's findings amount to improper post hoc rationalizations.  See Castro v. Acting Comm'r, Social Security Admin., No. 17-cv-399-JD, 2018 WL 1509078, at *3 (D.N.H. Mar. 27, 2018) ("In general, the court cannot affirm an agency decision, including a decision of the Acting Commissioner of Social Security, based on post hoc rationalizations that were not part of the decision.").  Accordingly, this Court finds that the ALJ's decision not to admit and consider the Meuse affidavit was not a harmless error.

IV.     ORDER

For the foregoing reasons, the Court grants Whitney's motion to the extent that he seeks remand and denies the Commissioner's motion to affirm.  The Court remands the case to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further findings and/or proceedings consistent with this opinion.

                                         /s/ Jennifer C. Boal
                                         JENNIFER C. BOAL
                                         United States Magistrate Judge